UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIE SIMPSON, | No.  2:12-cv-2516 TLN GGH P |
| Petitioner, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| DOMINGO URIBE, JR, | |
| Respondent. | |

*Introduction and Summary*

    Petitioner, Willie Simpson, was convicted on November 22, 2010 of residential burglary and robbery, with multiple enhancements for crimes against the elderly as well as two counts of misdemeanor elder abuse.  He was sentenced to 19 years imprisonment, but on appeal one of the enhancements (the lesser one year enhancement) imposed by the trial court was stayed.  Petitioner brings two related claims: that his confession was involuntary because of references to his wife and children during the interrogation where he ultimately confessed, and that defense counsel was ineffective for his actions in the confession suppression motion.  For the reasons that follow, the petition should be denied in its entirety.

1

*Factual Background*

The factual background is taken from the reasoned opinion of the California Court of Appeal; the Court of Appeal's statement about the interrogation is reserved to the discussion section.

### I. The Crimes

Rosina lived with her husband Lawrence and her twin sister. On the morning of April 23, 2010, the two women went grocery shopping. First, they stopped at the bank where Rosina withdrew $600. They returned home with the grocery bags in the trunk of the car. Lawrence came out to the garage to unload the groceries.

As Lawrence was unloading the bags, defendant grabbed him from behind and forced him to turn around, tearing his trousers. Defendant told Lawrence he was going to rob him. Lawrence yelled, "help." Rosina opened the door to the garage and came face to face with defendant, whom she described as a "monster." Defendant punched her and she fell; he hit her again as she tried to get up. Defendant took Rosina's purse and fled through the garage; as he ran past Lawrence, defendant pushed Lawrence against the car.

Heather and Donald Ferido were driving by when they saw defendant running out of the Arebalos' garage with something under his arm. Defendant entered a van through an already open driver's door. The Feridos wrote down the license plate number of the van and went to be with the Arebalos. When the police arrived, Donald Ferido gave an officer the van's license plate number.

### II. The Investigation

The police determined the van was registered to Monisha Roots, defendant's wife. A patrol officer, who was on the lookout for the van, saw it leaving a residence. He followed the van a short distance, stopped it, and detained the occupants. Defendant was driving; his wife was a passenger and two children were in the backseat.

Detective Michael Perez prepared a photographic lineup including defendant's picture and showed it to the Feridos. They both identified defendant as the man they saw running from the garage. Back at the station, Perez first spoke with Roots and then interviewed defendant.

People v. Simpson, 2012 WL 1559701, at *1-2 (Cal. Ct. App. May 3, 2012).

*AEDPA Legal Standards*

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

2

Death Penalty Act of 1996 (AEDPA). The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" Harrington v. Richter, 131 S. Ct. 770, 785 (2011). Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Id. at 784-785, citing Harris v. Reed, 489 U.S. 255, 265, 109 S. Ct. 1038 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 785.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows: "For purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Harrington, supra, 131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120 S. Ct. 1495 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786, citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140 (2004).

Accordingly, "a habeas court must determine what arguments or theories supported or … could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the

3

holding in a prior decision of this Court." Id. "Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" Id. Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id., citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S. Ct. 1166 (2003).

The undersigned also finds that the same deference is paid to the factual determinations of state courts. Under § 2254(d)(2), factual findings of the state courts are presumed to be correct subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." It makes no sense to interpret "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the same record could not abide by the state court factual determination. A petitioner must show clearly and convincingly that the factual determination is unreasonable. See Rice v. Collins, 546 U.S. 333, 338, 126 S. Ct. 969, 974 (2006).

The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002). Specifically, the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, supra, 131 S. Ct. at 786-787. "Clearly established" law is law that has been "squarely addressed" by the United States Supreme Court. Wright v. Van Patten, 552 U.S. 120, 125, 128 S. Ct. 743, 746 (2008). Thus, extrapolations of settled law to unique situations will not qualify as clearly established. See, e.g., Carey v. Musladin, 549 U.S. 70, 76, 127 S. Ct. 649, 653-54 (2006) (established law not permitting state sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear

prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly established law when spectators' conduct is the alleged cause of bias injection). The established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early, supra, 537 U.S. at 8, 123 S. Ct. at 365. Where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

Finally, if the state courts have not adjudicated the merits of the federal issue, no AEDPA deference is given; the issue is reviewed de novo under general principles of federal law. Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2012). However, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, ___ U.S. ___, 133 S. Ct. 1088, 1091 (2013).

*Discussion*

Involuntary Confession

The Court of Appeal set forth facts about defendant's statements. The undersigned has reviewed the record and finds them accurate, but the undersigned has added a few facts to further clarify the interrogation circumstances.

> III.  Defendant's Statements and Letter of Apology
>
> After advising defendant of his rights per Miranda,FN3 Perez asked him about his wife and told defendant she was upset. Perez explained that law enforcement had obtained the van's license plate at a robbery. The police had asked his wife who drove the van and she had provided a list. The only one on the list who matched the description of the robber was defendant. Defendant denied that he was near the location or committed a robbery.

5

> FN3. Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694].

Perez told defendant police would search his house, the van, and his wife's purse, and asked if they would find stolen property. Defendant said no, but admitted they might find a crystal pipe. Perez said they were looking for cash and noted there was a lot of cash in Roots's purse. Defendant explained his wife had $900 from cashing her check.

Perez told defendant that he was not being honest and repeatedly questioned him about whether he had a weapon. Defendant admitted that he had handed his wife two pieces of crystal methamphetamine when the police were following them earlier and that he had a drug habit. Perez told defendant, "The meth is on her and she's going to get booked for that." Defendant responded, "Ok, I can respect that."

Defendant asked what his wife's position was. Perez said, "She's out of the vehicle, we got it at the tow yard, she's here and she's got meth on her and then we got two kids." He explained that children can be released only to a biological parent,FN4 not a grandmother. Then Perez said, "But, see, what we're not going to do is hang the kids over your head...." Defendant again asserted that the methamphetamine in his wife's purse was his, but Perez asked, "How can we believe you on that if you won't tell the truth about the robbery?" Defendant responded he was going to tell the truth about everything, but he needed an "understanding" about his wife because she was pregnant and he did not want her "going through."

> FN4. Defendant was not the children's biological father.

Defendant asked if his wife would be able to go home with the children. Perez responded they "haven't gotten to that point." He explained that if they found stolen property during the searches and defendant claimed he knew nothing, they would have to talk to his wife again and consequently she was "not going to be released." He reminded defendant that his wife also possessed methamphetamine. When defendant again claimed the methamphetamine was his, Perez pointed out, "You also said that this is not you," meaning the robber.

Defendant then admitted he was the robber, but claimed he did not use a weapon or go in the house. Defendant said he went into the garage and did not hurt anyone; he just grabbed the purse. Defendant gave other details of the robbery, describing Heather Ferido and her vehicle, Rosina Arebalo and her car, and the denominations of the stolen cash—these details were fairly accurate, although he minimized his assaultive conduct. Defendant explained he was desperate to smoke crystal methamphetamine and was not trying to hurt anyone.

Perez asked defendant if he would like to write an apology letter and defendant said yes. Perez told him he would be left alone to

6

> write the letter. At the end of the interview defendant said to a different detective, "I'm confessing to a charge to get my wife out of this situation. They ain't gonna find shit."
>
> Defendant's letter of apology read: "To the lady I took the purse from: I'm so sincerely sorry for doing that to you. I promise on my life, I will give you everything I took from you. I didn't have any weapons on me when I took your purse. I humbly apologize to you and your family. Sincerely, please give me a chance. I have kids, a wife I need to be with. I'm not a bad person. Really, I was desperate for some money, and I can do whatever you want me to to repay you back for my mistake. Can you please forgive me, but not forget what I've done? I deeply am sorry for all the pain I caused you. Can you please?"

People v. Simpson, 2012 WL 1559701, at *2-3 (Cal. Ct. App. May 3, 2012).

There were, however, a few more references to petitioner's family, especially his children. Just before relating that his wife would not be released, (CT 282), the one interrogating detective indicated that jail was no place for his wife:

Simpson [petitioner] : That's my wife and those are my kids. So I want to get an understanding from y'all, you know what I'm saying…

Det. Jiminez: Not the kids…

Simpson: But I don't think y'all like that, you see what I'm saying.

Det. Perez: We don't want to take the kids…

Simpson: Yeah, yeah, you see what I'm saying, and I want them to be with their mom, you know what I'm saying.

Det. Perez: We sat in with your wife and the kids are in there, this is not the place for them.

(CT 281-282.)

Simpson then asked directly whether his wife would be released "today," and as related by the Court of Appeals, he was told "[w]e haven't gotten to that point [there was further questioning that needed to be done]…So she's not going to be released. (CT 282.)

Interesting also was the fact that petitioner had quasi-implicated himself prior to any significant reference to his family. In an effort to persuade the detectives that no weapon had been used, petitioner effectively put himself at the scene with knowledge of how the

7

1  burglary/robbery went down.

2  Det. Perez: And it says in this robbery report you were armed with a weapon.

3  [Petitioner] : I wasn't armed with nothing.  (laughs)

4  Det. Perez:  And when you go to court you're going to see what these people look like that are

5  saying this and they're going to be able to tell me whether a jury's going to believe them or not.

6  [Petitioner] *Okay but I wasn't armed with nothing*.

7  (CT 270.)

8      The undersigned will give the entirety of petitioner's retraction:

9  Gonzalez (a police officer that was apparently taking petitioner to jail); So what happened?  They

10  didn't even tell me.

11  [Petitioner]: I had to tell a lie.  I had to tell on myself.  I had to…

12  Gonzalez:  What?

13  Petitioner:  I confess (unintelligible).  To be honest with you I know better.  (Unintelligible)  I'm

14  confessing to a charge to get my wife out of this situation.  They ain't gonna find shit.  Shit

15  nowhere (Unintelligible).

16  (CT 293.)

17      The appellate court affirmed the trial court's refusal to suppress the confession:

> While Detective Perez initially brought up the topic of defendant's wife and how upset she was, it was defendant who raised the issue of her custody status and any potential charging decisions by asking about her "position right now." Unlike the wife in <u>Trout</u>, defendant's wife was properly detained because there was methamphetamine in her purse, as well as a large amount of money after a robbery in which over $600 was stolen. Defendant acknowledged it was proper to hold his wife because of the drugs, telling Perez, "Ok, I can respect that."
>
> Although Perez refused to accept defendant's claim that the drugs were his and not his wife's, citing defendant's lack of credibility due to his continued refusal to admit he was involved in the robbery, this appears to us to be a valid observation. Defendant's denial of involvement in the robbery was certainly suspect. Of the persons his wife admitted drove the van, only defendant matched the description of the robber. Witnesses had already identified defendant as the robber. Moreover, the record does not reveal the disposition of the possible drug charges.

28  /////

> At no time did Perez condition the release of defendant's wife and her children on his confession to the robbery. Rather, Perez made clear he was not going to "hang the kids over [defendant's] head." Defendant discounts this statement as purely self-serving; however, it was defendant, not the police, who raised the need for an "understanding" about his wife before he would tell the truth. When the issue was discussed, he was informed that she was "not going to be released," and nowhere in the record is that statement conditioned on defendant's confession or even cooperation. Even if defendant thought the confession would better his wife's situation, he was not told that, nor was it even suggested to him, just by him. The fact that his principal motive for confession may have been improvement of his wife's situation does not make the confession involuntary.

People v. Simpson at *4-5.

The federal law regarding involuntary confessions is as follows:

> The Constitution demands that confessions be made voluntarily. See Lego v. Twomey, 404 U.S. 477, 483-85, 92 S. Ct. 619 (1972). Involuntary confessions may not be used to convict criminal defendants because they are inherently untrustworthy and because society shares "the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." Spano v. New York, 360 U.S. 315, 320-21, 79 S. Ct. 1202 (1959). A confession is voluntary only if it is "'the product of a rational intellect and a free will.'" Medeiros v. Shimoda, 889 F.2d 819, 823 (9th Cir.1989) (quoting Townsend v. Sain, 372 U.S. 293, 307, 83 S. Ct. 745 (1963)). See also Blackburn v. Alabama, 361 U.S. 199, 208, 80 S. Ct. 274 (1960). "The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." Collazo v. Estelle, 940 F.2d 411, 416 (9th Cir.1991) (en banc) (quoting Culombe v. Connecticut, 367 U.S. 568, 602, 81 S. Ct. 1860 (1961)).
>
> "There is no 'talismanic definition of voluntariness' that is 'mechanically applicable.'" Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir.2003), rvs'd. on other grounds, Lockyer v.Andrade, supra, (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 224, 93 S. Ct. 2041 (1973)). Rather, voluntariness is to be determined in light of the totality of the circumstances. See

Miller v. Fenton, 474 U.S. 104, 112, 106 S. Ct. 445 (1985); Haynes v. Washington, 373 U.S. 503, 513, 83 S. Ct. 1336 (1963); Beatty v. Stewart, 303 F.3d 975, 992 (9th Cir.2002).  This includes consideration of both the characteristics of the petitioner and the details of the interrogation. Schneckloth, 412 U.S. at 226.  Relevant circumstances that should be considered include the following factors: (1) the youth of the accused; (2) his/her intelligence; (3) the lack of any advice to the accused of his/her constitutional rights; (4) the length of the detention; (5) the prolonged nature of the questioning; and (6) the use of any punishment such as the deprivation of food or sleep. Id. at 226; United States v. Haswood, 350 F.3d 1024, 1027 (9th Cir.2003).

Officials cannot extract a confession "by any sort of threats or violence, nor ... by any direct or implied promises, however slight, nor by the exertion of any improper influence." Hutto v. Ross, 429 U.S. 28, 30 (1976) (quoting Bram v. United States, 168 U.S. 532, 542-43, 18 S. Ct. 183 (1897)).[1]  Neither physical intimidation nor undue psychological pressure is permissible. Haswood, 350 F.3d at 1027 ("A confession is involuntary if coerced either by physical intimidation or psychological pressure."); United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir.1981) ("subtle psychological coercion suffices ... at times more effectively 'to overbear a rational intellect and a free will'").

False promises or threats may also render a confession invalid. See, e.g., Lynumn v. Illinois, 372 U.S. 528, 534, 83 S. Ct. 917 (1963) (confession found to be coerced by officers' false statements that state financial aid for defendant's infant children would be cut off, and her children taken from her, if she did not cooperate); Rogers v. Richmond, 365 U.S. 534, 541-45, 81 S. Ct. 735 (1961) (defendant's confession was coerced when it was obtained in response to a police threat to take defendant's wife into custody); Spano, 360 U.S. at 323 (confession found to be coerced where police instructed a friend of the accused to falsely state that petitioner's telephone call had gotten him into trouble, that his job was in jeopardy and that loss of his job would be disastrous to his three children, his wife and his unborn child); Miranda v. Arizona, 384

---

[1] This broadly-stated rule has not been applied to invalidate, per se, all statements made by a suspect in response to a promise made by law enforcement personnel.  Rather, the promise must be sufficiently compelling to overbear the suspect's will in light of all attendant circumstances. See Hutto, 429 U.S. at 30.

10

U.S. 436, 476, 86 S. Ct. 1602 (1966) ("any evidence that the accused was threatened, tricked, or cajoled into a waiver (of Fifth Amendment right to remain silent) will, of course, show that the defendant did not voluntarily waive his privilege"). But cf. Pollard v. Galaza, 290 F.3d 1030, 1034 (9th Cir.2002) ("misrepresentations made by law enforcement in obtaining a statement, while reprehensible, does not necessarily constitute coercive conduct").

Where an involuntary confession is improperly admitted at trial, a reviewing court must apply a harmless error analysis, assessing the error "in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." Arizona v. Fulminante, 499 U.S. 279, 308, 111 S. Ct. 1246, 113 L.Ed.2d 302 (1991). In the context of habeas review, the standard is whether the error had substantial and injurious effect or influence in determining the jury's verdict. See Brecht v. Abrahamson, 507 U.S. 619 637, 113 S. Ct. 1710; Beatty, 303 F.3d at 994. The analysis must be conducted with an awareness that "a confession is like no other evidence," and that "a full confession may have a 'profound impact' on the jury." Fulminante, 499 U.S. at 296. See also Taylor v. Maddox, 366 F.3d 992, 1017 (9th Cir. 2004).

The undersigned has paid special attention to the AEDPA Ninth Circuit case of Brown v. Horell, 644 F.3d 969 (9th Cir. 2011). This case analyzed a situation where an interrogated defendant was promised that he would get to see the birth of his child if he told the truth. Brown analyzed the spectrum of case law, especially the case of Lynum v. Illinois, 372 U.S. 528, 83 S. Ct. 917 (1963) [cited supra], in which the Supreme Court found an involuntary confession in the circumstances where an interrogated defendant was told that state financial aid for her children would be cut off and her children taken from her if she did not "cooperate." See also Rogers v. Richmond, 365 U.S. 534, 541-45, 81 S. Ct. 735 (1961) [cited supra] (defendant's confession was coerced when it was obtained in response to a police threat to take defendant's wife into custody). However, after a canvas of authority, the Brown court held that although threats and promises regarding one's children carry special force, Id. at 980 (and presumably cases involving one's spouse), "[t]hese cases reveal that lower federal courts do not always interpret Lynumn to mean that threats or promises relating to one's children or family warrant special caution, as we have in Tingle, but only that such threats or promises may be considered as part of the totality of the

circumstances." Brown, 644 F.3d at 982. The Brown court went on to find that although it might have decided the issue differently on a direct review, AEDPA directed a different result, i.e., fairminded jurists could disagree that the state court's decision conflicted with Supreme Court precedents.

The totality of the circumstances requires the same result here. The Court of Appeal was fair in assessing the situation as one where petitioner was as anxious to talk about his wife/kids, and make a deal, as the detectives were anxious to have petitioner relate his involvement in the burglary/robbery. Moreover, there existed a very legitimate reason to question petitioner about his wife — her vehicle had been identified and it was logical to suspect that she may well have been a participant in the burglary/robbery. This is not the situation where petitioner's wife was being hauled into the police station for bogus questioning for the sole purpose of pressuring petitioner; it is not the situation where the detectives were continually playing on petitioner's "moral code," when petitioner would not have otherwise thought about it much. This is not a situation where any promises were made about leaving the family alone if only petitioner would confess. There are situations where an accused may impose quite a bit of pressure on himself because of his family situation. However, the undue coercion must come from sources external to petitioner. No confession could ever stand up if the coercion test were that petitioner himself felt badly about his family's circumstances, and this inner tension made him confess.

From an AEDPA standpoint, and even if review were *de novo*, there is not much question about the result here. A harmless error analysis in the event of an involuntary confession should not be necessary. Nevertheless, for the sake of completeness, the undersigned finds that no substantial and injurious impact occurred even assuming that undue coercion made the confession involuntary.

First, as noted above, petitioner was no match for the detectives in this case and had quasi-implicated his guilt prior to any significant reference to his wife. However, the harmful error analysis does not hinge on that point.

The prosecution's case had two pillars: the confession, and the eyewitness testimony concerning the robber's van and identification of petitioner. Both pillars played significant roles

in petitioner's conviction. Nevertheless, the prosecution's case could well have stood up on the one non-confession pillar. As noted by the Court of Appeal, petitioner's wife's car was unequivocally seen at the crime scene, and the only logical inference to be drawn was that petitioner was driving it. In what appeared to be a fair photographic lineup, petitioner was identified separately by *both* eyewitnesses as the robber who exited the victims' home and drove the van.[2] The defense case — petitioner's wife had her vehicle all day (nowhere near the robbery scene), and petitioner was at home helping the neighbor cut grass and smoke marijuana, was almost laughable in its transparency. As the prosecutor told the jury in final summation, one did not have to "overthink" the case to find petitioner guilty. Although the prosecution did emphasize the confession, it cannot be argued under the rigorous AEDPA standard that the Court of Appeal got the harmful error analysis wrong.

Ineffective Assistance of Counsel

The legal standards for ineffective assistance of counsel require a "double deference": the deference normally given to judging counsel's actions and the AEDPA deference due to a state court's finding that counsel was not ineffective.

> There is no dispute that the clearly established federal law here is Strickland v. Washington. In Strickland, this Court made clear that "the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation ... [but] simply to ensure that criminal defendants receive a fair trial." 466 U.S., at 689, 104 S.Ct. 2052. Thus, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id., at 686, 104 S.Ct. 2052 (emphasis added). The Court acknowledged that "[t]here are countless ways to provide effective assistance in any given case," and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." Id., at 689, 104 S.Ct. 2052.
>
> Recognizing the "tempt[ation] for a defendant to second-guess counsel's assistance after conviction or adverse sentence," ibid., the Court established that counsel should be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," id.,

---

[2] Because there was a ten day separation from the date of the robbery to the date on which petitioner was found, no "fruits of the crime" evidence was discovered in any admissible sense.

13

> at 690, 104 S.Ct. 2052 . To overcome that presumption, a defendant must show that counsel failed to act "reasonabl[y] considering all the circumstances." Id., at 688, 104 S.Ct. 2052. The Court cautioned that "[t]he availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges." Id., at 690, 104 S.Ct. 2052.
>
> The Court also required that defendants prove prejudice. Id., at 691–692, 104 S.Ct. 2052. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id., at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Ibid. That requires a "substantial," not just "conceivable," likelihood of a different result. Richter, 562 U.S., at ——, 131 S.Ct., at 791.
>
> Our review of the California Supreme Court's decision is thus "doubly deferential." Knowles v. Mirzayance, 556 U.S. ——, ——, 129 S.Ct. 1411, 1413, 173 L.Ed.2d 251 (2009) (citing Yarborough v. Gentry, 540 U.S. 1, 5–6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam) ). We take a "highly deferential" look at counsel's performance, Strickland, supra, at 689, 104 S.Ct. 2052, through the "deferential lens of § 2254(d)," Mirzayance, supra, at ——, n. 2, 129 S.Ct., at 1419, n. 2.

Cullen v. Pinholster, __U.S.__, 131 S. Ct. 1388, 1403 (2011).

Petitioner focuses on the fact that his counsel did not present much to the court in terms of argument and written work concerning the motion to exclude his confession, and it was the state court trial judge who turned the correct focus to the involuntariness issue. Petitioner may be correct in that respect; however, petitioner cannot overcome the hurdle presented by the prejudice prong of Strickland. The Court of Appeal and the undersigned have determined that the confession was not involuntary, i.e., the police did not coerce the confession. Further, even if it were to be considered involuntary, admission of the confession does not undermine confidence in the verdict. Regardless of counsel's efforts, or lack thereof, regardless of the fact that it was the trial judge focused the issue correctly on the involuntariness issue, the confession was admissible—end of issue. Nothing counsel should have done would change that result.

Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate of appealability may issue only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For the reasons set forth in these findings and recommendations, a substantial showing of the denial of a constitutional right has not been made in this case.

*Conclusion*

IT IS HEREBY RECOMMENDED that:

1. The habeas corpus petition should be denied; and
2. The District Court decline to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: December 19, 2013

                  /s/ Gregory G. Hollows
             GREGORY G. HOLLOWS
   UNITED STATES MAGISTRATE JUDGE

SimpsonF&R